# UNITED STATES DISTRICT COURT

for the

Southern District of West Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   5:20-mj-0056 |
| Subject property located at 259 Sunset Drive, Alderson, WV 24910, and the person of Kimberly Crookshanks | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Subject property located at 259 Sunset Drive, Alderson, WV 24910, and the person of Kimberly Crookshanks - Further described in Attachment A.

located in the _____ Southern _____ District of _____ West Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252A | Possession of child pornography |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Terrance L. Taylor, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:   10/16/2020

_____

City and state:   Beckley, West Virginia

Omar J. Aboulhosn
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF THE SEARCH OF:
259 SUNSET DRIVE,
ALDERSON, WEST VIRGINIA 24910,       Case No. 5:20-mj-00056
AND THE PERSON OF KIMBERLY
CROOKSHANKS LOCATED THEREIN

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Terrance L. Taylor, being duly sworn, do hereby depose and
state the following:

I.   **INTRODUCTION**

1.   I am a Special Agent (SA) with the U. S. Department of
Homeland Security, Homeland Security Investigations ("HSI").  I
have been so employed since March 2012. I am currently assigned to
the Office of the Resident Agent in Charge HSI Charleston, West
Virginia.  Since this time, your Affiant has gained experience in
conducting investigations involving computers and the procedures
that are necessary to retrieve, collect, and preserve electronic
evidence.  Through your Affiant's training and experience,
including on-the-job discussions with other law enforcement agents
and cooperating suspects, I am familiar with the operational
techniques and organizational structure of child pornography

1

distribution networks and child pornography possessors and their use of computers and other media devices.

2.    I am a Special Agent with eighteen years of federal law enforcement experience.  Prior to my employment with HSI, your Affiant was a Police Officer for two years in Huntington, West Virginia, a Special Agent with the United States Department of State-Bureau of Diplomatic Security for six years, a Special Agent with the Naval Criminal Investigative Service for two years, and a Special Agent with the U. S. Department of State-Office of Inspector General (DOS OIG) for two years. I am a graduate of three federal law enforcement academies at the Federal Law Enforcement Training Center (FLETC) and a graduate of the West Virginia State Police Academy.  I graduated from the Criminal Investigator Training Program in 2002, and the Immigration and Customs Enforcement Special Agent Training Program in 2012. As part of these programs, I have received extensive training in the areas of law within the jurisdiction of HSI. These areas include laws and regulations pertaining to the importation of various types of merchandise and contraband, prohibited items, money laundering, and various immigration violations. I have more specifically received training in the areas of child pornography and the sexual exploitation and abuse of children. This training includes

2

specialized instruction on how to conduct criminal investigations related to violations of child protection laws pursuant to Title 18, United States Code, Sections 2251, 2252, 2252A, and 2256.

3.    As a special agent, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography. I have gained experience through training at the FLETC, Immigration and Customs Enforcement, as well as everyday work relating to investigations involving the receipt, possession, access with intent to view, production, importation, advertising, and distribution of child pornography that occur in the Southern District of West Virginia. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. I have obtained search warrants for child pornography offenses, and I have been the case agent or assisted others in numerous investigations involving the sexual exploitation of children. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2252(a)(2)(A) and (B)(2) (receipt or distribution of images, in interstate or foreign commerce, depicting a minor engaging in sexually explicit

3

conduct), 2252A(a)(2) (receipt or distribution of child pornography), 2251 (production of child pornography) and 2252A(a)(5)(B) (possession of child pornography), and I am authorized by law to request a search warrant.

## II.   <u>**PURPOSE OF THE AFFIDAVIT**</u>

4.   This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the location specifically described in Attachment A of this Affidavit, including the entire property located at 259 Sunset Drive, Alderson, Greenbrier County, West Virginia, (the "SUBJECT PREMISES"), the content of any cellular devices belonging to or used by KIMBERLY CROOKSHANKS (the "SUBJECT DEVICES"), any vehicle(s) located at the SUBJECT PREMISES, and the person of Kimberly CROOKSHANKS located at the SUBJECT PREMISES, for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2)(A) and (a)(5)(B), which items are more specifically described in Attachment B of this Affidavit.

5.   This Affidavit is also submitted in support of an application for a search warrant for the person described in Attachment A of this Affidavit, Kimberly CROOKSHANKS. As set forth herein, there is probable cause to search the person of

4

CROOKSHANKS, as described in Attachment A, for the items described in Attachment B, including cell phones, can be concealed on the person. I believe probable cause exists for the issuance of a warrant to search CROOKSHANKS, as described in Attachment A, for (1) property that constitutes evidence of a federal criminal offense; (2) contraband, the fruits of a federal crime, or things otherwise criminally possessed; and/or (3) property designated or intended for use or which is or has been used as the means for committing a federal criminal offense, namely 18 U.S.C. §§ 2252A(a)(2) (receipt or distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography).

6. The statements in this Affidavit are based in part on information provided by the National Center for Missing and Exploited Children (NCMEC), the HSI Cyber Crimes Center (C3), state and local law enforcement officers, and on my investigation of this matter. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations or attempted violations of 18 U.S.C. §§ 2252A(a)(2) and 2252A(a)(5)(B) receipt,

5

distribution, and possession of child pornography are presently located on the SUBJECT DEVICES.

## III. **STATUTORY AUTHORITY**

7.   As noted above, this investigation concerns alleged violations of the following:

> a. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

> b. 18 U.S.C. §2251 prohibits a person from employing, using, persuading, inducing, enticing or coercing any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such sexually explicit conduct, where the defendant knew or had reason to know that such visual depiction would be

trasnported or transmitted using any means or facility of interstate commerce.

c. 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing, or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## IV.   **DEFINITIONS**

8.   The following definitions apply to this Affidavit and Attachment B:

a. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

7

b. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

c. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage

functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

d. "Computer passwords" and "data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

e. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

f. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of

10

the subscribers to whom IP addresses are assigned on particular dates and times.

g. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

h. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

i. "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

j. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

k.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

l. A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

m. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

V.  **BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE**

9.  On October 15, 2019, Tumblr reported to NCMEC suspected child pornography via Cyber Tipline report numbers 57149768 and

57149821.    Tumblr    user    identified    with    screen/user    name
"reapersmith", e-mail address "jmikesmith2000@gmail.com," and
associated    Internet    Protocol    (IP)    addresses    75.109.17.51,
2601:1c0:8600:5de0:f5aa:1d9b:6415:3e1f,    and    173.81.241.5,
uploaded eleven child exploitation images of a female child to a
Tumblr chat with an unknown individual. The images were uploaded
on October 13, 2019, at 00:55:33 EDT.

10.   Tumblr captured the uploading of a specific file titled,
"9f9c8e168e93c22ffcb77595b11d17bd_tumblr_messaging_pzar0kxU7k1s7
o01x_raw.png" on October 13, 2019, with associated IP address
75.109.17.51.  This file is an image depicting a nude, pubescent
female approximately 11-13 years of age.  The female is lying on
her back with her legs pulled back and her legs spread open and
bare vagina exposed.  Semen is depicted on the female's vagina and
anus.  The female's face is not visible to the viewer.  However,
ten associated images of the female were also captured by Tumblr
in which the female's face and nude, developed breasts are visible
to the viewer.

11.   The Tumblr chat associated to "reapersmith" details his
relationship with the unknown female child.  "Reapersmith" claimed
to have an ongoing sexual relationship with a 13-year old girl
whom he babysat. "Reapersmith" claimed to be a friend of the

13

child's parents.  "Reapersmith" claimed to have been molesting the female child since she was three years old.

12.   On October 21, 2019, a subpoena/summons was issued to Yaana Technologies, LLC. regarding IP address 75.109.17.51. A review of the results obtained on November 4, 2019 identified the following account holder and address:

Subscriber Name: Jack SMITH

Service Address: ■ Cedar Knoll Drive, Ronceverte, WV

13.   In relation to the aforementioned Tumblr Cyber Tipline report, HSI C3 reported that Kik Interactive, Inc., identified a Kik user with screen/user name "grimreaper5150", e-mail address "jmikesmith2000@gmail.com," and associated Internet Protocol (IP) addresses 166.170.28.83 and 173.81.241.5, uploaded one child exploitation image of a female child to Kik.  The image was uploaded on March 22, 2019, at 04:57:25 UTC.

14.   Kik captured the uploading of the file through a PhotoDNA hash match on March 22, 2019. This file is an image depicting a nude, prepubescent female approximately 7-10 years of age with brown hair. The female is leaning on a bathtub while wearing handcuffs and ankle bracelets that are connected by a chain. The female's breasts and vagina are exposed in a full-frontal view to the viewer. The female's face is visible to the

14

viewer and her body does not appear to have developed pubic hair or breasts.

15.   On October 21, 2019, a subpoena/summons was served to Yaana Technologies, LLC. regarding IP address 173.81.241.5.   A review of the records obtained on November 4, 2019 identified the following account holder and address:

Subscriber Name: Alice Clark

Subscriber Address: ███ Calhoun Street, Alderson, WV

16.   On October 15, 2020, a search of a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses and other information was conducted for Jack Michael SMITH. These records indicated that Alice CLARK is the owner of the residence located at 278 Calhoun Street, Alderson, WV. These records also document a grandson of Jack Michael SMITH residing at that address.

17.   On October 1, 2020, your Affiant obtained West Virginia Driver's License information from the West Virginia Fusion Center. SMITH's West Virginia Identification Card, #I426144, depicted his photograph, listed his year of birth as 1986, and identified his Social Security Number. SMITH listed his address as ███Calhoun Street, Alderson, WV. SMITH's Identification card was issued on October 11, 2016.

18.   On or about October 7, 2020, contact was made with Alice CLARK. CLARK advised that her grandson, SMITH, moved out recently and moved in with his girlfriend CROOKSHANKS in Alderson, WV.

19.   A federal search warrant was executed on CROOKSHANKS' and SMITH's residence, located at 259 Sunset Drive, Alderson, West Virginia, on October 14, 2020. SMITH's cellular phone was seized pursuant to the warrant. A preview of the phone contents revealed text messages exchanges between SMITH and CROOKSHANKS. During the course of the messages, CROOKSHANKS stated that she took photographs of an infant child's genitalia and sent them to SMITH. CROOKSHANKS and SMITH further discussed their mutual desire to sexually abuse infants and children for their sexual gratification and produce videos and images of the abuse.

20.   Specifically, in one of the exchanges CROOKSHANKS references a video she sent to SMITH, stating "I'd rather see you fuck [victim] to death" "Literally" "Just like that vid I shared a while back" "Little cretin doesnt deserve to walk the earth".

21.   In another exchange, CROOKSHANKS asks if SMITH would like photos of the child, still in diapers, stating "If you want any pictures we can do it now. Up to you" "I was gonna put a clean pull up on her anyway". When SMITH says yes, CROOKSHANKS later texts "You like?" and "If I knew where the wipes were I could have

16

gotten some good ones". Based upon the entirety of the text message exchanges, your Affiant believes that CROOKSHANKS took pornographic photographs of a minor child for her sexual gratification and the sexual gratification of SMITH using her cellular phone.

## VII.     BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

22.  I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

   a. Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers and digital technology like cellular phones basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

   b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone

17

may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c. Mobile devices such as smartphones can connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.  Some media storage devices can easily be

concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h. With the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a

computer by simply connecting the camera or smartphone to the computer. In the last ten years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such pictures have become sharper and crisper. Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store up to 250 gigabytes of data, which provides enough space to store thousands of high-resolution photographs.

## VI.  CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

23. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who possess, receive, distribute, and/or access with intent to view child pornography:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually

20

suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment. These child

pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

f.  Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

g.  Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. It has long been recognized by professionals dealing with persons involved with child pornography that child pornography has enduring value to those involved in the sexual exploitation of children. Such persons rarely, if ever, dispose of their sexually explicit material. Those materials are often treated as prized possessions. Individuals involved in child pornography almost always maintain their materials in a place that they consider secure and where the materials

23

are readily accessible. Most frequently, these materials are kept within the privacy and security of their own homes. These materials are kept on their person in forms of media storage devices such as thumb drives and cellphones in their pants pockets and on their keychains.

24. Your Affiant believes that given the continuing nature of possession of child pornography and the general character of such offenders as "collectors" and "hoarders," there is probable cause to believe that evidence of violations of federal law, including, but not limited to, 18 U.S.C. §§ 2252A(a)(2) (receipt or distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography) will be present in the SUBJECT PREMISES, and on the person of CROOKSHANKS, as described in Attachment A, when the search is conducted. There is probable cause to believe that evidence of the violations of federal law, as described in Attachment B, will be located in the SUBJECT PREMISES and on the person of CROOKSHANKS, as described in Attachment A.

25. As described further in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PREMISES, in whatever form they are found.

26.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## IX.   BIOMETRIC ACCESS TO DEVICES

27.   This warrant permits law enforcement to compel Kimberly CROOKSHANKS to unlock any DEVICES requiring biometric access subject to seizure pursuant to this warrant.  The grounds for this request are as follows:

    a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric

features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is

26

called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on

27

devices produced by other manufacturers have different
names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic
devices often enable the aforementioned biometric
features because they are considered to be a more
convenient way to unlock a device than by entering a
numeric or alphanumeric passcode or password. Moreover,
in some instances, biometric features are considered to
be a more secure way to protect a device's contents.
This is particularly true when the users of a device are
engaged in criminal activities and thus have a
heightened concern about securing the contents of a
device.

f. As discussed in this Affidavit, your Affiant has reason
to believe that one or more digital devices will be found
during the search. The passcode or password that would
unlock the DEVICES subject to search under this warrant
currently is not known to law enforcement. Thus, law
enforcement personnel may not otherwise be able to
access the data contained within the DEVICES, making the
use of biometric features necessary to the execution of
the search authorized by this warrant.

28

g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h. Due to the foregoing, if law enforcement personnel encounter any DEVICES that are subject to seizure

pursuant to this warrant and may be unlocked using one
of the aforementioned biometric features, this warrant
permits law enforcement personnel to: (1) press or swipe
the fingers (including thumbs) of Kimberly CROOKSHANKS
to the fingerprint scanner of the DEVICES found; (2)
hold the DEVICES found in front of the face of Kimberly
CROOKSHANKS and activate the facial recognition feature;
and/or (3) hold the DEVICES found in front of the face
of Kimberly CROOKSHANKS and activate the iris
recognition feature, for the purpose of attempting to
unlock the DEVICES in order to search the contents as
authorized by this warrant. The proposed warrant does
not authorize law enforcement to compel that Kimberly
CROOKSHANKS state or otherwise provide the password or
any other means that may be used to unlock or access the
DEVICES. Moreover, the proposed warrant does not
authorize law enforcement to compel Kimberly CROOKSHANKS
to identify the specific biometric characteristics
(including the unique finger(s) or other physical
features) that may be used to unlock or access the
DEVICES.

## **VIII. CONCLUSION**

28. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

29. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

SPECIAL AGENT TERRANCE L. TAYLOR
DEPARTMENT OF HOMELAND SECURITY
HOMELAND SECURITY INVESTIGATIONS

Signed and sworn to by telephonic means on this _____ day
of October, 2020:


_____
OMAR J. ABOULHOSN
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

### DESCRIPTION OF LOCATIONS TO BE SEARCHED

A. The entire property located 259 Sunset Drive, Alderson, WV 24910, including the residential building, any outbuildings, and any appurtenances thereto (the SUBJECT PREMISES), any vehicle(s) located at the SUBJECT PREMISES. The SUBJECT PREMISES is more particularly described as a one-story, single-family residence with yellow siding and green shutters. The address number "259" is located on a mailbox in the front yard. A photograph of the property is included below.



B. The person of Kimberly CROOKSHANKS, should CROOKSHANKS be present at the SUBJECT PREMISES at the time the search warrant is executed.

## ATTACHMENT B

### ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. 2252A (a)(5)(B) and (b)(2):

1.    Computers or storage media used as a means to commit the violations described above, specifically any device belonging to or used by Kimberly CROOKSHANKS.

2.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e. evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

36

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography, as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), and child erotica.

5. Records, information, and items relating to violations of the statutes described above including:

a. Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, 259

37

Sunset Drive, Alderson, West Virginia, including utility and telephone bills, mail envelopes, or addressed correspondence;

b. Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d. Records and information relating to sexual exploitation of children, including correspondence and communications between users of child pornography and exploitation websites.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are also specifically authorized to compel Kimberly CROOKSHANKS to provide biometric features, including pressing  fingers (including thumbs) against and/or putting  a face before the sensor, or any other security feature requiring biometric recognition, of:

    (a)  any of the DEVICES found at the PREMISES, and

    (b)  where the DEVICES are limited to those which are capable
of  containing  and  reasonably  could  contain  fruits,
evidence, information, contraband, or instrumentalities

of the offense(s) as described in the search warrant
affidavit and warrant attachments,

for the purpose of attempting to unlock the DEVICES's security
features in order to search the contents as authorized by this
warrant.

This warrant does not authorize law enforcement personnel to
compel any other individuals found at the PREMISES to provide
biometric features, as described in the preceding paragraph, to
access or otherwise unlock any DEVICE.  Further, this warrant does
not authorize law enforcement personnel to request that Kimberly
CROOKSHANKS state or otherwise provide the password or any other
means that may be used to unlock or access the DEVICES, including
by identifying the specific biometric characteristics (including
the unique finger(s) or other physical features) that may be used
to unlock or access the DEVICES.